RECEIPT # _55838_
AMOUNT $_150__
SUMMONS ISSUED_✓_
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK._m_
DATE_____5-12-04_

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

| | |
|---|---|
| DAVID NAGER & ASSOCIATES, INC., )<br>**Plaintiff**, )<br> )<br> )<br> )<br> )<br>v. )<br> )<br>**UNIVERSAL AUTOMOTIVE, INC.,** )<br>**Defendant.** )<br>_____ ) | **COMPLAINT** |

**04 · 10 ̶ ̶ ̶ RGS**

**MAGISTRATE JUDGE** _Cohen_

### Introduction

1. Plaintiff David Nager & Associates, Inc. (*"Nager"*) brings this action against defendant Universal Automotive, Inc. (*"Universal"*) because of Universal's wrongful failure and refusal to honor its obligation to pay Nager substantial commissions Nager has earned as an independent sales representative of Universal.

### Parties

2. Nager is a Massachusetts corporation engaged in business as an independent sales representative with its principal place of business at 210 Highland Avenue, Needham, Massachusetts 02494.

3. Universal is an Illinois corporation engaged primarily in manufacturing and selling automotive brake and undercar parts with a principal place of business at 11859 South Central Avenue, Alsip, Illinois 60803.

### Jurisdiction and Venue

4. This Court has subject matter jurisdiction of this action pursuant to 28 U.S. Code § 1332 in

Universal are citizens of different states.

5. This Court has personal jurisdiction over Universal because Universal transacts business in Massachusetts within the meaning of Mass. Gen. Laws c. 223A, § 3(a), and has contracted to supply things here within the meaning of Mass. Gen. Laws c. 223A, § 3 (b).

6. Venue is proper in this District pursuant to 28 U.S. Code § 1391(a)(2), inasmuch as a substantial part of the events upon which this Complaint is based occurred here.

## Facts

7. In the early 1990s, pursuant to an agreement between Nager and Universal, Nager began acting as Universal's independent sales representative in New England, soliciting and accepting orders for Universal's products, including brake rotors, disc brake pads, brake shoes and hydraulic parts, all intended for the automotive aftermarket (*"Universal Parts"*).

8. Universal compensated Nager for its sales representative services on a commission basis, paying it certain percentages of the amounts Universal received from customers for the Universal Parts Nager sold.

9. The business relationship between Nager and Universal continued essentially unchanged over the years.

10. In or around 2002 and 2003 Nager started observing that certain Universal customers within Nager's territory had become disenchanted with Universal and were seeking or had already found alternatives for Universal Parts, due mainly to Universal's frequent failure to timely satisfy its delivery commitments.

11. Two of the major Universal customers within Nager's territory that had discontinued or significantly reduced their purchases of Universal Parts were Consumer Auto Parts, Inc. (*"CAP"*), of

Worcester, Massachusetts, and Lappen's Auto Supply, Inc. (*"Lappen's"*), of Quincy, Massachusetts.

12. Nager representatives developed strong business relationships with CAP and Lappen's over many years of dealings.

13. At Universal's request, in late 2003 Nager took a number of steps to reinstate Universal's status with CAP and Lappen's, including (i) arranging personal meetings between representatives of Universal and Nager, on one hand, and CAP and Lappen's, on the other hand; (ii) making frequent in-person sales calls on CAP and Lappen's; and (iii) making frequent telephone sales calls to CAP and Lappen's.

14. Nager's efforts with CAP and Lappen's were successful, in that both of them signed for the first time, in or around November or December 2003, two-year supply agreements with Universal, assuring Universal of about $700,000 of sales to CAP annually and $850,000 of sales to Lappen's annually, for total sales of at least $3,100,000 over the two-year period.

15. Nager's commissions on Universal's sales to CAP and Lappen's under the two-year supply agreements will be at least $100,000, using a commission rate of just over 3%, which is consistent with past commission rates Nager has earned.

16. In late 2003 Nager also made sales of Universal Parts to one new customer with which Universal had never done business, West Springfield [Massachusetts] Auto Parts (*"West Springfield"*), and significantly expanded sales of Universal Parts to another customer, J's Automotive Warehouse, Inc. (*"J's"*), of Salem, Massachusetts.

17. Universal's sales to West Springfield and J's will total at least $1,000,000 over the next two years, resulting in commissions to Nager of at least $30,000, using a commission rate of just over 3%.

*3*

18. Throughout the period in late 2003 when Nager was successfully selling Universal Parts to CAP, Lappen's, West Springfield and J's, Universal repeatedly assured Nager that Universal's relationship with Nager was excellent and would be unaffected by Universal's then proposed acquisition of assets of a subsidiary of TRW Automotive, Inc., which was engaged in the manufacture and sale of automotive undercar parts.

19. Throughout the period in late 2003 when Nager was successfully selling Universal Parts to CAP, Lappen's, West Springfield and J's, Nager acquiesced to Universal's frequent requests that Nager assist Universal in integrating the newly acquired TRW Automotive, Inc. assets into Universal's business and that Nager refrain from entering into new independent sales representative agreements with competitors of Universal to replace the Universal relationship.

20. In early 2004, only after Nager's efforts had brought about the more than $4,000,000 worth of agreements between Universal, on one hand, and CAP, Lappen's, West Springfield and J's, on the other hand, Universal orally informed Nager that Universal intended to replace Nager as its independent sales representative in New England.

21. By letter dated March 25, 2004 Universal purported to give Nager "30 days notice" of the termination of Universal's agreement with Nager, "effective ... April 12, 2004," eighteen days later.

22 Universal's March 25 letter to Nager further stated that "[i]n accordance with our agreement, you will be paid your earned commissions on all qualified Universal (UBP) net sales generated within your territory of New England (#65) thru the termination date."

23. Nager never agreed, orally or in writing, at any time during its decade-long relationship with Universal, that Universal had the right to deprive Nager of commissions on sales of Universal Parts Nager had secured under contract, based on Universal's purported unilateral termination of

*4*

Parts Nager had secured under contract, based on Universal's purported unilateral termination of their agreement or otherwise.

### Count I
*(Breach of Contract)*

24. Nager realleges the allegations contained in the foregoing paragraphs as if fully restated herein.

25. By purporting to terminate its relationship with Nager and denying Nager earned commissions under the four lucrative sales contracts Nager secured in late 2003, Universal has breached its agreement with Nager.

26. By failing to pay Nager amounts Universal owes Nager as commissions from other sales unrelated to these four contracts, Universal has further breached its agreement with Nager.

27. As the result of said breaches, Nager has incurred substantial damages.

### Count II
*(Breach of the Covenant of Good Faith and Fair Dealing)*

28. Nager realleges the allegations contained in the foregoing paragraphs as if fully restated herein.

29. Universal's termination of its relationship with Nager without good cause just after Nager had secured four lucrative sales contracts for Universal, entitling Nager to substantial commissions, was undertaken for the purpose of denying Nager earned commissions.

30. By reason of the conduct referred to in paragraph 29, above, Universal has breached the implied covenant of good faith and fair dealing in its agreement with Nager.

31. As the result of said breach, Nager has incurred substantial damages.

## Count III
### *(Unjust Enrichment)*

32. Nager realleges the allegations contained in the foregoing paragraphs as if fully restated herein.

33. With the expectation that it would be paid commissions at the historic rate, Nager expended substantial labor in late 2003 securing four lucrative sales contracts on behalf of Universal.

34. After said contracts were executed, Universal without cause purported to terminate its relationship with Nager and has purported to deny  Nager its right to obtain sales commissions on said contracts.

35. Universal has thus been unjustly enriched at Nager's expense and, as a matter of equity, Nager should be compensated for sales efforts that will result in substantial profits for Universal.

## Count IV
### *(Violation of M.G.L. c. 93A)*

36. Nager realleges the allegations contained in the foregoing paragraphs as if fully restated herein.

37. At all times relevant hereto, Universal and Nager were engaged in trade or commerce within Massachusetts.

38. In terminating its relationship with Nager for the purpose of denying Nager earned commissions on lucrative sales contracts Nager had secured -- after assuring Nager that Universal's relationship with Nager was excellent and would be unaffected by Universal's proposed acquisition of assets of another company,  and obtaining Nager's  acquiescence to Universal's requests that Nager assist Universal in integrating the newly acquired assets into Universal's business and refrain

from entering into replacement independent sales representative agreements with Universal's competitors -- Universal has engaged in unfair and deceptive acts and practices in the conduct of trade or commerce in violation of Mass. Gen. Laws c. 93A, §11.

39. Universal's violative conduct occurred primarily and substantially within Massachusetts.

40. Universal's violative acts were performed knowingly and willfully.

41. By reason of Universal's violations of Mass. Gen. Laws c.93A, §11, Nager is entitled not only to recover the substantial damages inflicted upon it by Universal, but also to treble damages and attorneys' fees.

**WHEREFORE**, Nager prays for the following relief:

a.  That on Count I of the Complaint judgment enter against Universal and in favor of Nager in an amount to be determined by this Court;

b.  That on Count II of the Complaint judgment enter against Universal and in favor of Nager in an amount to be determined by this Court;

c.  That on Count III of the Complaint judgment enter against Universal and in favor of Nager in an amount to be determined by this Court;

d.  That on Count IV of the Complaint judgment enter against Universal and in favor of Nager in an amount to be determined by this Court, including treble damages and attorneys' fees;

e.  That Nager be awarded its costs and attorneys' fees incurred in this action; and

f.  That Nager be granted such other and further relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

Date: May 12, 2004                          David Nager & Associates, Inc.

                                            By its attorneys,

                                            _William A. DeVasher, Jr._

                                            William A. DeVasher, Jr.
                                                BBO Nº 552010
                                            Michael B. Cosentino
                                                BBO Nº 558036
                                            Molly Cochran
                                                BBO Nº 551833
                                            Seegel, Lipshutz & Wilchins, P.C.
                                            Wellesley Office Park
                                            60 William Street, Suite 200
                                            Wellesley, Massachusetts 02481
                                                    781.237.4400 (telephone)
                                                    781.235.2333 (telefax)

*8*